IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DARLENE DOTSON, | ) | 1:09-CV-1325  AWI GSA |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | ORDER ON DEFENDANTS' |
| | ) | MOTION FOR SUMMARY |
| **COUNTY OF KERN, GREG GAUSE,** | ) | JUDGMENT |
| **BILL DRAKOS, LISA GAVEN-CRUSE,** | ) | |
| **RICK ERICKSON, FELICIA SKAGGS,** | ) | |
| **and DOES 1 through 30,** | ) | (Doc. No. 28) |
| | ) | |
| **Defendants.** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

This is an employment discrimination case brought by Plaintiff Darlene Dotson ("Dotson") against her employer Defendant Kern County ("the County") and fellow County employees Bill Drakos ("Drakos") and Felicia Skaggs ("Skaggs").[1]  Dotson alleges causes of action under 42 U.S.C. § 2000e *et seq.* ("Title VII") and California Government Code § 1200 *et seq.* (the California Fair Employment and Housing Act – "FEHA").   Defendants now move for summary judgment on all remaining claims in this case.[2]   For the reasons that follow, the Court will grant Defendants' motion and close this case

---

[1] On October 27, 2009, the Court dismissed all claims against County employees Greg Gause, Rick Erickson, and Lisa Gavin-Cruse.  See Court's Docket Doc. No. 15.

[2] On November 17, 2010, the Court granted summary judgment in favor of the County on the second (racial discrimination under Title VII), third (racial discrimination under FEHA), sixth (gender discrimination under Title VII), and seventh (gender discrimination under FEHA) causes of action.  The basis for summary judgment on these claims was the failure to file a timely administrative complaint as required by Title VII and FEHA.  See Court's Docket Doc. No. 27 at 7:10-9:18.

# FACTUAL BACKGROUND[3]

Dotson began her employment with the County in 1999 as a Substance Abuse Specialist 1 ("SAS 1"). In that capacity, Dotson counseled with drug-dependent adults. Dotson worked, and continues to work, in the County's Mental Health Department.

Dotson filed a charge with the EEOC on October 23, 2007. See DUMF 2. Under the "Discrimination Based On" section of the October 2007 Charge, only the box for "retaliation" is marked. See Defendants' Ex. B. Under the "Particulars" section of the October 2007 Charge, it reads: "(I) In or around August 2006, I filed an internal complaint alleging racial and sexual harassment [against Greg Gause]. In or around June 2007, I received a less than favorable performance evaluation. I have been an employee of the county since November 1999. (II) No reason was given for the less than favorable performance evaluation. (III) I believe I have been discriminated against in retaliation for having participated in a protected activity in violation of Title VII . . . ." Id.

The offensive conduct of Greg Gause towards Dotson occurred between January 2006 and August 2006. DUMF 5. Gause was removed from the Mental Health Court team on August 30, 2006. Id. Lisa Gavin-Cruse ("Gavin-Cruse"), Dotson's supervisor during the Gause incident, declared that she believed that Dotson had done the right thing in complaining about Gause. See Gavin-Cruse Dec. ¶ 5. After August 30, 2006, there were no further incidents of sexual harassment, racial discrimination, or other inappropriate behavior between Gause and Dotson. Id. Dotson did not file with the EEOC or DFEH a charge of discrimination or harassment pertaining to comments made by Gause within one year of the alleged comments by Gause. DUMF 6.[4]

---

[3]DUMF refers to "Defendants' Undisputed Material Fact." Also, in opposing some of the DUMF's, Dotson cites portions of her complaint. However, in opposing summary judgment, reliance on the allegations of complaint is insufficient. Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008). Instead, actual evidence must be submitted. Id. The mere citation to the complaint's allegations creates no dispute. Id. Additionally, Dotson has cited to page 48 of her deposition and to the declaration of Jessica Chavaria. However, as Defendants rightly point out, see Court's Docket Doc. No. 32 at 5:1 & n.1, 7:16-20, Dotson did not file or otherwise provide these pieces of evidence. As such, Chavaria's declaration and page 48 of Dotson's deposition are not part of this motion.

[4]Dotson disputes this claim by stating that she complained to Kern County employees. DUMF 6 is clearly and expressly limited to the EEOC and DFEH. DUMF 6 is not disputed.

2

On April 7, 2008, Dotson filed a second charge with the EEOC.  See DUMF 3.  Under the "Particulars" section of the April 2008 Charge, it reads: "(I) On October 23, 2007, I filed a charge of discrimination with the EEOC . . . wherein I alleged differential treatment in retaliation for have [sic] participated in a protected activity.  From on or about November 9, 2007, and continuing until the present, I have been harassed, transferred, repeatedly questioned about my certification, denied accommodation for my disabilities, denied Continuing Education Units, and denied a promotion to SAS II.  (II) No reason has been given for this treatment.  (III) I believe I have been discriminated against in retaliation for having participated in a protected activity and my disabilities in violation of Title VII . . . and Title I of the Americans with Disabilities Act."  See Defendant's Ex. C.

In 2007, the Mental Health Court team was required to move its physical location to a facility known as Westwind due to the need to consolidate services as a result of budget cuts.  DUMF 15.  In late September/early October 2007, Dotson told her supervisors that she did not want to transfer to Westwind due to the presence there of individuals with whom she had experienced conflicts earlier in her career.  See DUMF 16; Defendants Ex. J.  Dotson was told by her superiors that if she did not want to transfer with her team to Westwind, she would need to transfer to another team.  DUMF 17.  Dotson told her superiors that she did not want to transfer to the ACT team due to travel and work hour requirements for the job.  DUMF 18.  To honor her request to not be assigned to Westwind or the ACT team, Dotson was transferred to the Green Gardens facility after her previous team transferred to Westwind.  See DUMF 19.  Dotson's supervisors at Green Gardens, Drakos, Skaggs, and Terry Parks ("Parks"), did not know that when Dotson came to work at Green Gardens that she had made previous complaints about Gause.  See DUMF 24; Drakos Dec. ¶¶ 2-3 ; Parks Dec. ¶ 2; Skaggs Dec. ¶ 2.[5]

---

[5]Dotson argues that, given the information in her personnel file and the common way in which information is spread, it is inconceivable that Drakos, Parks, and Skaggs did not know about her complaints against Gause.  See Court Docket Doc. No. 30-1 at 6:25-7:8.  This response creates no genuine dispute.  First, there is no evidence whatsoever regarding Dotson's personnel file, including what is in it, or when or even if Drakos, Parks, and Skaggs reviewed the file.  Second, Dotson cites to her Exhibits D and E, which are the August 28, 2006, and September 1, 2006, internal grievances related to Gause's conduct.  The mere existence of these grievances does not show knowledge by Drakos, Parks, and Skaggs, especially since they were not the supervisors when the grievances were filed.  Finally, Dotson relies on the declaration of her attorney in which he summarizes statements made by a Kern County attorney about Dotson.  See Kodam Dec. ¶ 3.  The statements were made during a mandatory worker's

In November 2007, an issue arose regarding Dotson's work schedule at Green Gardens. See Plaintiff's Ex. F.  Drakos initially refused Dotson's request to work a 9/80 schedule.  See DUMF's 23; Plaintiff's Ex. F.  Dotson was not allowed to work a 9/80 schedule for approximately one to two pay periods, that is two to four weeks, while her supervisors verified the medical need for a 9/80 schedule.  DUMF 23.[6]  The decision to initially disallow the 9/80 schedule was made by Drakos.  Id.  On November 29, 2007, Dotson wrote a letter to Dr. Terleski (a deputy director of the Mental Health Department) about not being allowed to work under the 9/80 schedule.  See  Plaintiff's Ex. F.  Dotson also submitted a letter from Dr. Cousin dated November 29, 2007, which stated that Dotson was to work a 9/80 schedule.  See Defendants' Ex. F.  Skaggs eventually authorized the 9/80 work schedule.  DUMF 23.  Drakos's initial refusal to allow Dotson to work a 9/80 schedule had nothing to do with any complaints she had made against anyone and was not retaliatory.  DUMF 25.[7]  Although Drakos from time to time would approve temporary alternative work schedules, he did not approve of 9/80 work schedules because, in his experience, individuals under the 9/80 schedule were not as productive.  See Drakos Dec. ¶ 2.  At the time Dotson requested to work under the 9/80 schedule, Skaggs was

compensation settlement conference.  Id.  The declaration indicates that the Kern County attorney said that Dotson was a troublemaker, files multiple complaints, and makes things up in her head.  Id.  Dotson's counsel states that it seemed to him that the Kern County attorney had knowledge beyond the worker's compensation claim.  See id.  This evidence is not helpful.  The statements were in an unrelated matter and in an adversarial context.  Further, the statements say nothing about gender, race, or disability complaints, and they in no way indicate that Drakos, Skaggs, or Parks had knowledge of Dotson's complaints.  There is no connection between the attorney's statements and this case or the knowledge of Drakos, Skaggs, and Parks.  Since Dotson has failed to submit any evidence that indicates that Drakos, Skaggs, and Parks knew of Dotson's complaints, DUMF 24 is undisputed.

[6]Plaintiff disputes this DUMF by arguing that, since a note had previously been provided, Drakos's actions can only be explained by a need to retaliate.  This does not dispute the substance of DUMF 23.

[7]Plaintiff disputes this DUMF by arguing that Defendants' position ignores the prior documentation and notes about her restrictions.  Plaintiff cites three pieces of evidence in support of this argument.  Plaintiff cites a portion of her deposition in which she testifies about diabetes related restrictions in 2005, see Dotson Depo. 105:10-22, an October 13, 2005, letter from Dr. Cousins that lists Dotson's restrictions, see Plaintiff's Ex. C, and the November 29, 2007, letter from Dotson to Dr. Terleski.  See Plaintiff's Ex. F.  This evidence does not create a genuine dispute.  The deposition testimony and the October 2005 letter merely establish the existence of the restrictions, they do not show Drakos's knowledge (especially since Drakos was not Dotson's supervisor until 2007).  The November 29, 2007, letter was created after Drakos refused to approve the 9/80 schedule.  See Plaintiff's Ex. F (in part describing Drakos's refusal to approve the 9/80 schedule); Drakos Dec. ¶ 3.  As discussed above, there is no evidence that Drakos reviewed Dotson's personnel file, nor is there evidence of the contents of Dotson's personnel file.  Drakos's uncontradicted declaration states he was not aware that Dotson was working a 9/80 schedule.  See id.  Dotson has failed to submit facts that actually dispute this DUMF.

4

1  unaware of anyone working a 9/80 schedule who was under Drakos's supervision.  See Skaggs

2  Dec. ¶ 3.  From October 2005, Dotson had worked under a restricted schedule pursuant to an

3  October 14, 2005 doctor's note.  See Dotson Depo. 105:10-22; Plaintiff's Ex. C.

4       Sometime in 2007, the County began implementing a computer record and data system

5  called Anasazi.  See Gutierrez Dec. ¶ 5; Defendants' Ex. H.  Because the Anasazi system was to

6  become the exclusive means of documenting services provided, employees needed to become

7  competent in using Anasazi.  See Gavin-Cruse Dec. ¶ 4.  There were problems with the Anasazi

8  system, especially during the first year of implementation.  See Dotson Depo. 56:16-25;

9  Gutierrez Dec. ¶ 6.  Dotson experienced problems on a daily basis, including her computer

10 freezing and losing 20 to 30 minutes worth of data entry.  See Dotson Depo. 56:16-25.  Dotson

11 also experienced problems with entries being in a different server or under a different staff

12 member's name.  See Skaggs Depo. 38:11-21.  Other County employees experienced the loss of

13 notes and other work information on a regular basis due to the Anasazi system freezing.

14 See Gutierrez Dec. ¶ 6.  One County employee opined that it was virtually impossible to meet the

15 75% productivity requirement because of the problems with the Anasazi system.  See Gutierrez

16 Dec. ¶ 8.  The County still experiences some problems with Anasazi.  See Skaggs Depo. 38:24-

17 39:1.  Dotson reported her problems with the Anasazi system to Skaggs, and reported the

18 problems daily to Drakos.  See Dotson Depo. 56:16-25.  Skaggs had Anasazi staff come and try

19 to work on Dotson's computer to fix some of the problems.  See Skaggs Depo. 39:18-19.  Dotson

20 received what she describes as "very little" training on the Anasazi system.  See Dotson Depo.

21 156:6-8.  Rick Erickson was at least partly responsible for training Dotson on the Anasazi

22 system, but he would not go to Dotson's desk even when Dotson had questions.  See id. at

23 156:14-157:7.  Dotson believed that she went to Skaggs's team without knowing about parts of

24 Anasazi because Erickson did not show her.  See id.

25       Dotson was not eligible for promotion from SAS 1 to SAS 2 prior to 2008 because she

26 did not possess a CADAAC certification.  DUMF 26.[8]  Defendants' contend that Dotson was not

27

28    [8] Plaintiff disputes this DUMF by arguing that it was the County's practice to promote on merit and even a
prior supervisor had recommended Dotson for promotion in 2003.  Plaintiff also states that others have advised her
that they were promoted without CADAAC certification.  However, despite these arguments, there is not a genuine

reclassified or promoted from SAS 1 to SAS 2 at the time of her request in 2008 because her productivity was significantly below the department standard of 75%. See DUMF 27. The 2007/2008 evaluation indicates that Dotson's productivity was 57.64% without factoring in the first two months with the new Green Gardens team due to problems with the Anasazi system. See Defendants' Ex. E. The evaluation states that, if the first two months were included, productivity would have been 49.11%. See id. Defendants contend that the denial of a promotion at that time had nothing to do with prior complaints that Dotson had made and was not retaliatory. See DUMF 27. The Mental Health Department productivity standard is a vital component in generating sufficient revenue to fund the direct client services provided by employees of the Department to the community. DUMF 28.[9] Dotson is aware of one employee, Jessie Chavaria, who was promoted despite not meeting the 75% productivity rating. See Dotson Depo. 63:24-64:6; 64:14-16.[10] Skaggs did not have authority to promote Dotson, but recommended Dotson for promotion in 2008. DUMF 29.

In May 2007, December 2007, June 2008, and July 2008, Dotson received memoranda from the County regarding professional certification. See Defendants' Ex. O. Dotson understood that she was required by state law to keep a current copy of her professional

---

dispute. The four pieces of evidence cited by Dotson do not support her arguments: a page from her deposition that was not provided to the Court, a portion of Skaggs' deposition that relates to her recommendation to promote in 2008, and two grievances that Dotson filed against Jim Waterman and Drakos in October 2008. This evidence has nothing to do with pre-2008 promotion requirements or practices. As for the assertion that others have told Dotson that they were promoted, there is no evidence presented in support of this hearsay statement, and counsel's bare assertion is not evidence. Exeter Bancorporation, Inc. v. Kemper Secs. Group, Inc., 58 F.3d 1306, 1312 n.5 (8th Cir. 1995); Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1982); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951-52 (9th Cir. 1978). Finally, even if a supervisor recommended Dotson for promotion in 2003, i.e. three years prior to Dotson's complaints against Gause, that she was not promoted indicates that the CADAAC is a genuine requirement. DUMF 26 is undisputed.

[9]Plaintiff disputes this DUMF through arguments relating to the non-existence of uniform standards for employees. However, such arguments do not address the substance of DUMF 28. Thus, DUMF 28 is undisputed.

[10]Dotson also testified that Brian Whitfield did not meet the 75% requirement, but that she did not know what his percentage was. See Dotson Depo. 64:8-9. Defendants object to testimony regarding Whitfield based on a lack of personal knowledge. Dotson does not respond to the objection. The Court will sustain the objection because there is no description of how or why Dotson knows that Whitfield did not meet the 75% requirement, and knowledge is not apparent from the limited deposition pages provided. In fact, Dotson states that she did not "know exactly what his [Whitfield] was." Additionally, Defendants also object to portions of testimony about Chavaria based on lack of personal knowledge. However, Dotson testified that she heard Chavaria read her productivity number and Dotson read Chavaria's evaluation, which read "not met." This testimony shows knowledge by Dotson that Chavaria did not meet the 75% requirement. The objection with respect to Chavaria is overruled.

certification on file with the County.  DUMF 31.  The memoranda sent to Dotson indicate that she needed to submit a current certification to the Mental Health Department, and they were sent to all licensed or certified employees employed by Mental Health because they were required by department policy.  DUMF 32.  In 2007-2008, there were approximately 300 employees in the Mental Health Department with professional licenses, certificates, or registrations.  Id.  In 2008-2009, there were approximately 750 such employees.  See id.  Even though Dotson did not need to be certified to work as an SAS 1, because she was certified and was providing drug counseling services, the Mental Health Department needed proof that Dotson was still authorized by the State to provide those services.  DUMF 33.  The memoranda sent to Dotson regarding her certification were not the product of retaliation.  DUMF 34.  Skaggs did not question Dotson's certification as a substance abuse counselor.  DUMF 35.

Dotson has obtained all of her required Continuing Education Units each year she has been employed with the County.  DUMF 36.  However, Dotson had to obtain some of the credits on her own.  See Dotson Depo. 70:6-10.  On February 25, 2008, Drakos denied a request by Dotson to attend a continuing education program.  See Defendants Ex. M; see also Drakos Dec. ¶ 7.  Defendants contend that Drakos's refusal to approve Dotson's attendance at a continuing education program was based on her lack of productivity and that the subject matter of the course did not pertain to Dotson's clients.  See DUMF 37;[11] Drakos Dec. ¶ 7.  Defendants contend that it had nothing to do with any complaints Dotson had made at a prior time and was not retaliatory. Id.  As it turned out, there was no urgency for plaintiff to attend the training.  Id.  Skaggs did not withhold continuing education units from Dotson and did not restrict her opportunity to obtain them.  DUMF 38.

Dotson was off work beginning in October 2008 due to a knee injury which she sustained at work and for which she desired surgery.  DUMF 20.  When Dotson returned from knee surgery in 2009, she was transferred to a position in another division that was not as physically

---

[11] Plaintiff disputes this DUMF in part by citing to the two grievances (one each) that she filed against Drakos and Jim Waterman.  However, the evidence submitted indicates that Drakos denied the continuing education course in February 2008, but the two grievances were both filed in October 2008.  See Defendants' Ex. M; Plaintiff's Exs. H, I.  Since the grievance had not yet been filed, the grievance could not have possibly influenced Drakos's decision to deny approval of the course.  Plaintiffs' Exhibits H and I do not dispute in any way DUMF 37.

1  demanding.  DUMF 21.  In Dotson's new position, she is not required to meet a productivity

2  standard.  DUMF 22.  Dotson was promoted to SAS 2 in June 2010.  DUMF 30.

3       Dotson received every increment raise to which she was entitled as an SAS 1 while

4  employed by the County.  DUMF 7.  Dotson has never been demoted or had her compensation

5  reduced while employed by the County.  DUMF 8.[12]  Dotson has never been suspended while

6  employed by the County.  DUMF 9.  As an SAS 1, Dotson has not received an evaluation with an

7  overall rating lower than "standard" while employed by the County.  DUMF 10.[13]

8       Dotson first complained to a supervisor about Gause's behavior about two months prior

9  to his removal from the Mental Health Court team on August 30, 2006.  DUMF 11.  Dotson was

10  rated overall as performing at a "standard" level both before she complained about Gause and

11  after she complained about Gause.  DUMF 12.[14]  Defendants contend that Dotson's 2006/2007

12  performance rating was based on her performance and was not retaliatory.  See DUMF 13.  The

13  2006/2007 performance rating was signed by Dotson's then supervisors (Rick Erickson and Lisa

14  Gavin-Cruse) on May 10, 2007.  See Defendants' Ex. H.  Dotson was rated as "standard" on 23

15  of 27 categories, rated "above standard" on 3 categories, and rated "improvement needed" on the

16  "promptness in completing work" category.  See id.  Dotson refused to sign the evaluation.  See

17  id.  Gavin-Cruse's evaluation was based in part on concerns that Dotson was not documenting

18  her sessions in a timely manner and Dotson was continuing to have difficulty with the Anasazi

19  system.  See Gavin-Cruse Dec. ¶ 3.

20       Defendants contend that Dotson's 2007/2008 performance evaluation was based on her

21

22  [12] Plaintiff disputes this DUMF by arguing that she was not promoted and has been "blackballed" to the point that she has a bad reputation.  See Court's Docket Doc. No. 30-1 at 2:15-20.  However, this argument does not dispute the fact that she was not demoted and did not have her pay reduced.  DUMF 8 is undisputed.

23

24  [13] Plaintiff disputes this DUMF by making arguments that do not address the actual substance of the DUMF. Further, this DUMF is based on Plaintiff's admission in response to a Rule 36 request for admission that she never received an overall rating below "standard."  See Plaintiff's Ex. A.  Plaintiff's admission conclusively establishes the fact that she never received an overall rating lower than "standard" as an SAS 1.  See Fed. R. Civ. Pro. 36(b); Hadley v. United States, 45 F.3d 1345, 1348 (9th Cir. 1995); Plaintiff's Ex. A.  DUMF 10 is undisputed.

25

26

27  [14] Plaintiff disputes this DUMF by making the same arguments, and citing nearly the identical evidence, as she did in connection with DUMF 10.  Plaintiff again makes arguments that do not actually dispute that she was rated overall as "standard" both before and after she complained about Gause.  Further, Plaintiff has admitted pursuant to Rule 36(b) that she never received an overall rating below "standard" as an SAS 1 (and she was promoted to SAS 2 in 2010).  See Plaintiff's Ex. A; DUMF 30.  Therefore, DUMF 12 is undisputed.

28

1   performance and was not retaliatory.  See DUMF 14.  The 2007/2008 performance rating was

2   signed by Drakos on September 12, 2008.  See Defendants Ex. E.  On the 2007/2008 evaluation,

3   Dotson is rated "standard" on 22 of 27 categories, rated "above standard" on 4 categories, and

4   rated "unsatisfactory" on the "volume of work produced" category.  See id.  Terry Parks

5   replaced Skaggs in August 2008.  Se Skaggs Dec. ¶ 7; Parks Dec. ¶ 2.  Parks wrote on the

6   evaluation that Dotson had refused to sign, that Dotson was offered a special 3 month evaluation

7   for purposes of obtaining a promotion, but Dotson refused the 3 month evaluation.  See

8   Defendants Ex. E.  Skaggs did not sign the 2007/2008 evaluation because she had originally

9   rated Dotson as "improvement needed" under the "volume of work produced" category and had

10  recommended Dotson for promotion to SAS 2.  See Skaggs Dec. ¶ 9; Skaggs Depo. 82:10-16;

11  Parks Dec. ¶ 3.  Skaggs testified she was aware that Dotson had filed a grievance or complaint

12  against the County for its failure to promote her, and from an administrative view, promotion

13  should be considered to protect the County.  See Skaggs Depo. 67:16-68:12.  However, Skaggs

14  did not think that an overall rating higher than "standard" for Dotson was justified because of

15  Dotson's low productivity.  See Skaggs Dec. ¶ 9.  Drakos refused to authorize promotion for

16  Dotson, and he ordered Parks to delete the recommendation for promotion and to change the

17  rating under the "volume of work produced" category from "improvement needed" to

18  "unsatisfactory."  See Drakos Dec. ¶ 5; Skaggs Dec. ¶ 6; Parks Dec. ¶ 3.

19

20                          **SUMMARY JUDGMENT FRAMEWORK**

21          Summary judgment is appropriate when it is demonstrated that there exists no genuine

22  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

23  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

24  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

25  judgment bears the initial burden of informing the court of the basis for its motion and of

26  identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

27  absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

28  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference

may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008);

UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

material fact does not spring into being simply because a litigant claims that one exists or

promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

"motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427

F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

circumstances to consider materials that are not properly brought to its attention, but the court is

not required to examine the entire file for evidence establishing a genuine issue of material fact

where the evidence is not set forth in the opposing papers with adequate references.  See

Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San

Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails

to produce evidence sufficient to create a genuine issue of material fact, the moving party is

entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

**DEFENDANTS' MOTION**

**1.**     **Ninth Claim – Title VII Disability Discrimination**

The County argues that summary judgment on this claim is appropriate because disability

is not a protected class under Title VII.  Dotson does not expressly respond to this argument or

specifically defend this cause of action.

*Resolution*

Summary judgment on this claim is appropriate.  First, it is recognized that if the moving

party meets its initial burden on summary judgment and the non-moving party fails to address or

raise the claim in opposition to summary judgment, the Court may deem the claim abandoned

and grant summary judgment.  See Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008); Coufal

Abogados v. AT&T, Inc., 223 F.3d 932, 937 (9th Cir. 2000); Doe v. Dickenson, 615 F.Supp.2d

1002, 1010 (D. Ariz. 2009).  Because Dotson did not acknowledge this claim or Defendants'

argument, she has abandoned it.  Second, Title VII protects persons on the basis of "race, color,

religion, sex, or national origin," it does not protect persons on the basis of disability.  See 42

U.S.C. §§ 2000e-2(a)(1), (m); Rahmann v. Wal-Mart Stores, Inc., 2010 U.S. Dist. LEXIS 21020,

*11-*12 (D. S.C. Mar. 8, 2010); Montanez v. Education Tech. College, 660 F.Supp.2d 235, 243

(D. P.R. 2009); Scott v. City of Yuba City, 2008 U.S. Dist. LEXIS 80307, *11 (E.D. Cal. July 7,

2008).  Thus, summary judgment on this cause of action is appropriate.

## 2.    Fourth Claim (Title VII) & Fifth Claim (FEHA) – Retaliation

### *Defendant's Argument*

The County argues that Dotson's claims fail because there was no adverse action, there is

no causal link, and/or there were legitimate, non-retaliatory reasons behind each employment

action alleged.  Dotson identifies several actions in her complaint as retaliatory, but they are not

actionable.  First, with respect to performance reviews, Dotson was rated overall as "standard"

both before and after her complaints, and her ratings during annual evaluations were based on

legitimate concerns over her productivity, including her learning the Anasazi system.  Second,

the transfer to Green Gardens was an attempt to accommodate her request to not work at

Westwind or the ACT team, and her transfer in 2009 was an attempt to accommodate her recent

knee surgery.  Third, Dotson was denied the 9/80 work schedule for a very limited period of

time.  Neither Skaggs nor Drakos knew that Dotson had been working the 9/80 schedule, neither

Skaggs nor Drakos knew that Dotson had participated in protected activity, and once a current

doctor's note was received, the 9/80 schedule was approved.  Fourth, the denial of promotions

were based on either Dotson's failure to obtain CADAAC certification or her low productivity.

With respect to certification memoranda, Dotson was one of over 300 people to get these

memoranda and her receipt of some of the memoranda was an error, but it had nothing to do with

any protected activity.  Fifth, on one occasion Dotson was denied permission to attend a

continuing education class because of her low productivity and because the class dealt with

juveniles, whereas Dotson's clients were adults.  Finally, any attempt by Dotson to rely on

conduct by Gause is time barred.

*Plaintiff's Opposition*

Dotson argues that she filed complaints against Gause, filed complaints with the EEOC and DFEH, requested accommodation for her disability, and raised complaints about the failure to accommodate her alternative work schedule.  These are protected activities.  Over the past years, Dotson suffered adverse employment actions through Defendants' failure to promote, poor marks on the 2007 and 2008 annual reviews, failure to accommodate, and denial of continuing education courses.  The reasons offered by Defendants for this conduct are manufactured.

First, the County "routinely promoted" individuals regardless of certifications.  Prior to filing complaints, Plaintiff had been recommended for promotion despite not having the CADAAC certification.

Second, Dotson's productivity was impacted by a new computer system.  Dotson received minimal training, and the system would constantly freeze up and lose notes/entries and had numerous problems.  The 75% requirement was not communicated or enforced prior to Dotson's complaints, and other individuals were promoted despite not meeting the 75% requirement.[15] Dotson received poor marks for the 2007 and 2008 reviews, and these "reviews are for the first two years for which the Defendant County went through their computer conversion.  Defendants knew that all employees' productivity were affected."  Opposition at 7:18-20.  Also, Skaggs did not sign the 2008 review or approve of the changes made to the 2008 review because she did not agree with them.

Third, Defendants have a history of retaliating against employees who complain.  Also, as described in counsel's declaration, the County has blackballed Dotson as a troublemaker because of her complaints about Gause and requests for accommodation.  Other employees who suffered productivity issues or similar matters were not subject to the same treatment as Dotson endured.[16]

---

[15]No evidence is cited in support of the assertion that the 75% requirement was not communicated.  See Opposition at 8:6-8.  Counsel's statement is not evidence.  Angel, 653 F.2d at 1299.

[16]No evidence is cited in support of the assertion that other employees who had similar production issues or "similar matters" as Dotson were treated differently than Dotson.  See Opposition at 8:18-21.  Counsel's statement is not evidence.  Exeter, 58 F.3d at 1312 n.5; Angel, 653 F.2d at 1299; British Airways, 585 F.2d at 951-52.

1     *Legal Standard*

2     a.      Title VII

3     Title VII prohibits an employer from retaliating against an employee because that person

4 has opposed any unlawful employment practice, or has made a charge, testified, assisted, or

5 participated in an employment discrimination investigation or proceeding.  See 42 U.S.C. §

6 2000e-3(a); Nilsson v. City of Mesa, 503 F.3d 947, 953 (9th Cir. 2007); Ray v. Henderson, 217

7 F.3d 1234, 1240 (9th Cir. 2000).  In order to establish a prima facie case of retaliation under Title

8 VII, a plaintiff must show that: (1) she engaged in an activity protected under Title VII; (2) her

9 employer subjected her to an adverse employment action; and (3) a causal link exists between the

10 protected activity and the adverse employment action.  See Nilsson, 503 F.3d at 953-54; Thomas

11 v. City of Beaverton, 379 F.3d 802, 812 (9th Cir. 2004); Ray, 217 F.3d at 1240.  If the plaintiff

12 meets her burden of establishing a prima facie case, the burden shifts to the defendant to

13 articulate a legitimate non-retaliatory reason for its decision.  See Nilsson, 503 F.3d at 954; Ray,

14 217 F.3d at 1240.  If the defendant meets its burden of setting forth a non-retaliatory reason, the

15 burden shifts back to the plaintiff to submit evidence that indicates that the defendant's proffered

16 reason is merely a pretext for a retaliatory motive.  See Nilsson, 503 F.3d at 954; Ray, 217 F.3d

17 at 1240.

18     With respect to the prima facie case, an "adverse employment action" is an employment

19 action that is "reasonably likely to deter employees from engaging in protected activity."  Ray,

20 217 F.3d at 1243.  "Among those employment decisions that can constitute an adverse

21 employment action are termination, dissemination of a negative employment reference, issuance

22 of an undeserved negative performance review and refusal to consider for promotion."  Brooks v.

23 City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  Further, that "an employer's actions were

24 caused by an employee's engagement in protected activities may be inferred from proximity in

25 time between the protected action and the allegedly retaliatory employment decision."  Raad v.

26 Fairbanks N. Star Borough, 323 F.3d 1185, 1197 (9th Cir. 2003); Ray, 217 F.3d at 1244.  That is,

27 "causation can be inferred from timing alone where an adverse employment action follows on the

28 heels of protected activity."  Van Asdale v. Int'l Game Tech., 577 F.3d 989, 1002 (9th Cir.

2009); Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir, 2002). However, the
Ninth Circuit has determined that "a specified time period cannot be a mechanically applied
criterion," and an analysis of temporal proximity cannot be done "without due regard to [the]
factual setting." Van Asdale, 577 F.3d at 1002; Coszalter v. City of Salem, 320 F.3d 968, 977-78
(9th Cir. 2003). "There is no set time beyond which acts cannot support an inference of
retaliation, and there is no set time within which acts necessarily support an inference of
retaliation." Coszalter, 320 F.3d at 978. Additionally, "the plaintiff must make some showing
sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had
engaged in protected activity." Raad, 323 F.3d at 1197; Cohen v. Fred Meyer, Inc., 686 F.2d
793, 796 (9th Cir. 1982). Stated differently, a plaintiff must present evidence that shows that the
particular decision maker who authorized or committed the adverse employment action was
aware that plaintiff had engaged in protected activity. See Raad, 323 F.3d at 1197; Cohen, 682
F.2d at 796-97; Gunther v. County of Washington, 623 F.2d 1303, 1316 (9th Cir. 1979). Finally,
to show pretext, a plaintiff can produce "either direct evidence, such as clearly sexist, racist, or
similarly discriminatory statements or actions by the employer, or circumstantial evidence
supporting an inference of retaliatory or discriminatory motive, so long as such evidence is
'specific and substantial.'" Munoz v. Mabus, 630 F.3d 856, 865 (9th Cir. 2010); Winarto v.
Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1284 (9th Cir. 2001).

b.    FEHA

The standards and analysis of retaliation claims under FEHA are very similar to
retaliation claims under Title VII. The same burden shifting framework is utilized in both Title
VII and FEHA. That is, the plaintiff must establish a prima facie case of retaliation by showing
that: (1) she engaged in a protected activity, (2) the defendant subjected her to an adverse
employment action, and (3) there was a causal link between the two." Yanowitz v. L'Oreal USA,
Inc., 36 Cal.4th 1028, 1042 (2005); Scotch v. Art Institute of Cal., 173 Cal.App.4th 986, 1020
(2009); Jones v. Department of Corrections & Rehabilitation, 152 Cal.App.4th 1367, 1380
(2007). Once the prima facie case is established, the burden shifts to the defendant to show a
legitimate, nondiscriminatory reason for the adverse action. Yanowitz, 36 Cal.4th at 1042;

15

1    Scotch, 173 Cal.App.4th at 1020; Jones, 152 Cal.App.4th at 1380.  Upon making such a

2    showing, the burden shifts back to the plaintiff to establish intentional retaliation.  Yanowitz, 36

3    Cal.4th at 1042; Scotch, 173 Cal.App.4th at 1021; Jones, 152 Cal.App.4th at 1380.

4           With respect to the prima facie case, as in Title VII, the timing between the plaintiff

5    engaging in protected conducted and the defendant committing an adverse employment action

6    may indicate a sufficient causal connection.  See Scotch, 173 Cal.App.4th at 1020; Loggins v.

7    Kaiser Permanente Internat., 151 Cal.App.4th 1102, 1112 (2007).  Also, the plaintiff must

8    present evidence that the employer was aware that the plaintiff had engaged in the protected

9    activity.  George v. California Unemployment Ins. Appeals Bd., 179 Cal.App.4th 1475, 1491

10   (2009); Morgan v. Regents of University of Cal., 88 Cal.App.4th 52, 70 (2001).  However, the

11   California Supreme Court has rejected the Ninth Circuit's definition of an "adverse employment

12   action."  See Yanowitz, 36 Cal.4th at 1036.  Instead, an "adverse employment action" under

13   FEHA is an employment action "that materially affects the terms, conditions, or privileges of

14   employment, rather than simply . . . an adverse action or treatment that reasonably would deter an

15   employee from engaging in protected activity."  Id. at 1051; see Jones, 152 Cal.App.4th at 1380.

16          *Discussion*

17          Before the Court analyzes the arguments of the parties under the retaliation claims,

18   several preliminary matters should be addressed.

19          The allegations under the fourth cause of action for retaliation under Title VII incorporate

20   by reference all previous paragraphs.  Prior paragraphs include allegations related to disability

21   discrimination.  Additionally, Dotson's opposition appears to rely on disability related conduct

22   by the County.  To the extent that Dotson is relying on disability related conduct, such reliance

23   under the fourth cause of action is misplaced.  Title VII is the statute that Dotson expressly cites

24   under the fourth cause of action.  As discussed above, disability is not a protected class under

25   Title VII.  Accordingly, to the extent that Dotson is alleging Title VII retaliation based on

26   disability related conduct, such a claim is not cognizable and summary judgment is appropriate.

27   See 42 U.S.C. § 2000ee-2(a)(1), (m); Rahmann, 2010 U.S. Dist. LEXIS 21020 at *11-*12;

28   Montanez, 660 F.Supp.2d at 243; Scott, 2008 U.S. Dist. LEXIS 80307 at *11.

1    Additionally, Dotson is unclear in identifying which adverse employment actions were in

2   response to which protected activities.  Dotson has generally argued that she suffered retaliation

3   for making complaints against Gause in 2006 (the "Gause Complaint"), for filing EEOC charges

4   on October 23, 2007 ("the October 2007 Charge") and April 7, 2008 ("the April 2008 Charge"),

5   and for complaining to Dr. Terleski about the 9/80 schedule on November 29, 2007 ("the

6   Terleski Letter").[17]  See Opposition at 6:11-18.  The County's reply does not expressly address

7   the propriety of relying on each of these activities.  Given the County's failure to address the

8   propriety of relying on these acts as protected activities, for purposes of this motion, the Court

9   will consider and analyze the protected activities identified by Dotson, i.e. the Gause Complaint,

10   the October 2007 Charge, the April 2008 Charge, and the Terleski Letter.

11    Further, in her opposition, Dotson does not dispute that some of the County's actions

12   were not retaliatory.  Dotson does not dispute that her receipt of memoranda regarding

13   certification was non-retaliatory nor does she dispute that her transfers to Green Gardens and her

14   current position were non-retaliatory.  The evidence submitted by the County shows that the

15   transfers were an attempt to accommodate either Dotson's surgery or her express requests to

16   transfer to a different location.  See DUMF's 15, 16, 19, 20, 21.  The evidence submitted by the

17   County shows that the memoranda were the result of administrative error and/or standard

18   procedure that affected 300 employees.  See DUMF's 32, 33, 34.  Because Dotson does not

19   dispute that her transfers and her receipt of memoranda were not retaliatory, the transfers and

20   certification memoranda cannot form the basis of a retaliation claim.  Accordingly, the Court will

21   limit its analysis to Dotson's contentions regarding her annual evaluations, the failure to promote,

22   the failure to accommodate, and the failure to authorize continuing education credits.

23    Finally, Dotson has not offered any "direct" evidence of retaliatory intent.  When

24   attacking the County's proffered reasons for the adverse employment actions, Dotson relies

25   entirely on circumstantial evidence.  As such, after making a *prima facie* case, and when the

26

27       [17]In Plaintiff's response to Defendants' undisputed facts, Dotson included internal complaints dated
    October 2, 2008, against Drakos, Parks, and Jim Waterman.  The Court will not consider these complaints.  First,
28   Dotson does not rely on these complaints or address them in her opposition argument.  See Court's Docket Doc. No.
    30.  Second, Dotson has identified no retaliatory conduct that occurred post-October 2, 2008.

1   County proffers a non-retaliatory explanation, Dotson must present specific and substantial

2   evidence of pretext.  See Munoz, 630 F.3d at 865; Nilsson, 503 F.3d at 953-54; Yanowitz, 36

3   Cal.4th at 1042.

4       With this these preliminary matters addressed, the Court will proceed to analyze Dotson's

5   identified "adverse employments actions" in relation to her identified "protected activities."[18]

6       *a.*     *2006/2007 Performance Evaluation*

7       Dotson's 2006/2007 Evaluation was signed by Dotson's then supervisors, Rick Erickson

8   and Lisa Gavin-Cruse, on May 10, 2007.  See Defendants' Ex. H.  The Gause Complaint is the

9   only identified protected activity at issue relative to the 2006/2007 Evaluation because all of the

10  other identified activities post-date May 10, 2007.

11      Dotson contends that the 2006/2007 Evaluation contains false information and

12  undeserved ratings.  The parties acknowledge that undeserved performance reviews/evaluations

13  can be adverse employment actions under Title VII.  See Brooks, 229 F.3d at 928.  Dotson does

14  not expressly explain which parts of the evaluation were false or undeserved.  While there are

15  less "above standard" ratings in the 2006/2007 Evaluation than in the previous evaluation, there

16  is only one category that is rated as less then standard.  Based on the general tenor of the

17  opposition, it appears that Dotson is complaining about her rating as "needs improvement" under

18  the "promptness of completing work" category.[19]  See Opposition at 7:1-22.  In the absence of

19  express identification by Dotson, the Court will focus its analysis on the "needs improvement"

20  rating under the "promptness in completing work" category.

21      There is no doubt that Gavin-Cruse was aware of the Gause Complaint prior to May 10,

22  2007, because she is the one who removed Gause from Dotson's work unit.  See Gavin-Cruse

23  Dec. ¶ 2.  Gause was removed on August 30, 2006, from Dotson's work unit as a direct result of

24  Dotson's complaint.  See id.; see also DUMF 5.  However, approximately nine months elapsed

25  from the Gause Complaint to the 2006/2007 Evaluation.  See Gavin-Cruse Dec. ¶¶ 2, 3;

26  ─────────────

27      [18]Given the similarity between FEHA and Title VII, unless the Court notes otherwise, its analysis applies
    equally to both Dotson's FEHA and Title VII claims.

28      [19]The Court notes that a rating of "standard" under the "volume of work produced" category was given in
    both the 2005/2006 and 2006/2007 evaluations.  See Defendants' Exs. F, H.

1  Defendants Ex. H; Plaintiff Exs. D, E.  Further, Gavin-Cruse declared that her investigation

2  confirmed Dotson's allegations against Gause, and that Gavin-Cruse believed that Dotson had

3  done the right thing in complaining about Gause.  See Gavin-Cruse Dec. ¶ 5.  These

4  circumstances do not indicate a causal link, and Dotson does not explain how a causal link exists.

5  There is therefore a failure to establish a causal link.[20]

6        Alternatively, if there is a causal link, Gavin-Cruse declared that Dotson's ratings were

7  based on Dotson's continuing difficulty in learning the new Anasazi computer data-entry system

8  and Dotson's failure to document sessions in a timely manner as required by Medi-Cal.[21]  See

9  Gavin-Cruse Dec. ¶¶ 3-4.  This is a neutral, non-retaliatory reason for giving a rating of "needs

10 improvement" on the "promptness of completing work" category.  As such, it is incumbent upon

11 Dotson to show that this proffered reason is pretext.

12       In her opposition, Dotson has cited a portion of her deposition that indicates that Erickson

13 did not come to her desk when she had questions about Anasazi, a portion of her deposition that

14 indicates that she had daily problems with Anasazi (including her computer freezing or loss of

15 data after 30 minutes of input), and Jean Gutierrez's declaration that everyone was negatively

16 impacted by Anasazi.  See Opposition at 7:1-20.  This evidence is not specific and substantial.

17       While the Court accepts that Erickson did not come to Dotson's desk to answer questions,

18 Gavin-Cruse declared that all employees under her received training on Anasazi, and when it

19 became apparent that Dotson was having problems, Dotson was provided additional training.

20 See Gavin-Cruse Dec. ¶ 4.  Dotson nowhere discusses either the initial training she received

21 (other than to call it "very little") or the additional training that she received, nor does Dotson

22 submit evidence that disputes whether she received additional training.  With respect to

23 _____

24 [20]It does not appear to the Court that the "needs improvement" rating is an "adverse employment action"
   under FEHA.  California courts have held that "a mere oral or written criticism of an employee . . . does not meet the

25 definition of an adverse employment action under FEHA," but that an "unfavorable employee evaluation may be
   actionable where the employee proves the employer subsequently uses the evaluation as a basis to detrimentally alter

26 the terms or conditions of the recipient's employment."  Akers v. County of San Diego, 95 Cal.App.4th 1441, 1457
   (2002).  However, since Defendants have not sufficiently explained their position about "adverse employment

27 actions" under FEHA, and since the result will not change, the Court need not decide whether the performance rating
   is an "adverse employment action" under FEHA.

28       [21]Gavin-Cruse also declared that it was important and expected for all employees to become proficient in
   Anasazi.  See Gavin-Cruse Dec. ¶ 4.

1  Gutierrez's declaration, Gutierrez does indicate that other employees experienced regular

2  problems with Anasazi.  See Gutierrez Dec. ¶ 6.  However, Gutierrez's declaration does not

3  indicate in what unit she works, whether she worked with Dotson, whether she knew the amount

4  and types of problems that Dotson had, whether she knew the types and amount of problems that

5  other employees in Dotson's unit at that time experienced, or how other employees under

6  Erickson and Gavin-Cruse were rated.  In other words, Gutierrez's declaration does not show a

7  basis for her to comment about Dotson's particular performance or situation.

8          There is no doubt that Dotson experienced problems with Anasazi, and those problems

9  negatively affected her performance by slowing her down.  However, more evidence is needed

10 that the "improvement needed" rating was unwarranted in Dotson's particular case.  For

11 example, there is no evidence regarding the types of problems experienced by others in her unit

12 or the ratings that they received.  There is simply no specific and substantial evidence that shows

13 that the County's proffered reason for the "improvement needed" rating under the "promptness in

14 completing work" category was pretext.[22]

15         Because Dotson's has not shown a causal link, and because Dotson has failed to provide

16 specific and substantial evidence of pretext, the 2006/2007 Evaluation was not retaliatory.

17 Summary judgment on this claim is appropriate.

18         *b.*     *Failure To Accommodate*

19         The only identified instance of a failure to accommodate occurred in November 2007,

20 when Dotson was initially told that she could not work the 9/80 schedule without a doctor's note.

21 See Plaintiff's Ex. F; DUMF 23.  In the Terleski Letter (dated November 29, 2007), Dotson

22 explained that Skaggs told her on November 15, 2007, that Drakos would have to approve the

23 9/80 schedule.  See Plaintiff's Ex. F.  Dotson also explained that Drakos informed her that a

24 doctor's note was necessary.  See id.  A doctor's note also dated November 29, 2007, was

25 submitted to the County, and Skaggs subsequently approved the 9/80 schedule.  See DUMF 23;

26 Defendants' Ex. F.  The failure to accommodate pre-dates the April 2008 Charge and, by days,

27

28         [22]Also, Dotson does not specifically address the criticism regarding timely documenting sessions for Medi-Cal purposes.

20

1   predates the Terleski Letter.  The Court will therefore analyze Dotson's failure to accommodate

2   claim in relation to the Gause Complaint and the October 2007 Charge.  Further, in the absence

3   of any other identified conduct, the Court views Dotson's failure to accommodate claim as based

4   entirely on Drakos's failure to approve a 9/80 work schedule for two to four weeks, beginning on

5   November 15, 2007.[23]  See DUMF 23; Plaintiff Ex. F; Defendants Ex. F.

6        With respect to the Gause Complaint, there is no genuine dispute that Drakos did not

7   know about the Gause Complaint.  See DUMF 24.  Without awareness or knowledge of the

8   protected activity, there can be no retaliation.  See Raad, 323 F.3d at 1197; Gunther, 623 F.2d at

9   1316.  Further, approximately fourteen months had elapsed from the time of the Gause

10  Complaint to the November 2007 failure to accommodate.  This is an extensive period of time.

11  Cf. Villiarimo, 281 F.3d at 1065 (finding a 18 month lapse to be too long to support causation).

12  Also, the Gause Complaint involved different personnel, different supervisors, a different work

13  unit/team, and a different physical location.  There is no indication why Drakos would wish to

14  retaliate against Dotson for her complaints against Gause.  Dotson has failed to establish a *prima*

15  *facie* case of retaliation based on the Gause Complaint.

16       With respect to the October 2007 Charge, there is no evidence that Drakos was aware of

17  this charge.  The October 2007 Charge was actually filed on October 23, 2007, and the initial

18  failure to accommodate appears to have been November 15, 2007.  See Defendants' Ex. B;

19  Plaintiff's Ex. F.  This is a short period of time, and there is no evidence that the EEOC

20  contacted Drakos (or the County) in that short period of time.[24]  Moreover, the circumstances do

21  not necessarily indicate a clear reason why Drakos would retaliate.  The October 2007 Charge

22  complained about retaliatory performance evaluations in June 2007.  See Defendants' Ex. B.

23  Neither Drakos nor Skaggs participated in the 2006/2007 Evaluation.  That evaluation was

24

25       [23]As explained above, Dotson did not adequately dispute DUMF 25 and DUMF 25 stated that the refusal to
    allow the 9/80 schedule was not retaliatory.  See DUMF 25; Court's Docket Doc. No. 30-1 at 7:15-23.  Dotson's
26  failure to sufficiently dispute DUMF 25 is an adequate ground for summary judgment.  Out of caution and as an
    alternative holding, the Court will review the failure to accommodate claim apart from DUMF 25.
27

28       [24]The EEOC did not issue a right to sue letter on the October 23, 2007 Charge until April 30, 2009.  See
    Complaint at ¶ 12(n) & Exs. A, B.  This lengthy period of time indicates that it is unlikely that the EEOC contacted
    the County prior to November 15, 2007.

performed by Erickson and Gavin-Cruse.  Like the Gause Complaint, the October 2007 Charge involved different personnel, different supervisors, a different work team/unit, and a different physical location.  The October 2007 Charge had nothing to do with Drakos, and without additional evidence, it is not necessarily clear why Drakos would retaliate for it.  As such, Dotson has failed to establish a causal link with the October 2007 Charge.

However, even assuming that there is a causal link between the November 2007 failure to accommodate and the October 2007 Charge, Defendants have identified a non-retaliatory reason for the initial denial.  Drakos has declared that he did not approve of 9/80 schedules because, in his experience, individuals under the 9/80 schedule were not as productive.  See Drakos Dec. ¶ 2. In other words, as a matter of course Drakos does not approve of the 9/80 schedule because of productivity concerns.  This is a non-retaliatory explanation for the denial.

Dotson does not expressly explain how this reason is pretext.  Dotson points out that she was working under the 9/80 schedule prior to her transfer to Green Gardens.  However, the Terleski Letter indicates that Skaggs told Dotson that Gavin-Cruse (the previous supervisor) had not mentioned the 9/80 schedule to her, and that Gavin-Cruse did not remember if she told Drakos about the 9/80 schedule.  See Plaintiff Ex. F.  Drakos's declaration indicates that it was Dotson who brought the 9/80 schedule to his attention, and that he did not know that she had been working the 9/80 schedule prior to transfer.  See Drakos Dec. ¶¶ 2, 3.  It is not apparent that Drakos knew that Dotson was working the 9/80 schedule before the transfer.  Nevertheless, even if Drakos knew about the 9/80 schedule, it does not cast doubt on Drakos's general disapproval of 9/80 schedules.  Dotson has presented no evidence that Drakos approved of other 9/80 schedules on anything other than a temporary basis.  See Drakos Dec. ¶ 3.  Skaggs has declared that, when Dotson talked to her about the 9/80 schedule, no one under Skaggs's and Drakos's supervision had been allowed to work the 9/80 schedule.  See Skaggs Dec. ¶ 3.  Once Drakos learned that new medical authorization had been given and that Skaggs had approved the schedule, he permitted Dotson to work the 9/80 schedule.  See Drakos Dec. ¶ 3.  The evidence

before the Court indicates that Drakos's refusal was simply his standard policy.[25]  See Drakos

Dec. ¶ 3; Skaggs Dec. ¶ 3.  Dotson has not produced specific and substantial evidence that the

proffered reason for the initial failure to allow a 9/80 schedule was pretext.

Because Dotson's has not shown a causal link, and because Dotson has failed to provide

specific and substantial evidence of pretext, the November 2007 failure to accommodate, i.e. the

initial failure to approve a 9/80 work schedule, was not retaliatory.[26]  Summary judgment on this

claim is appropriate.

   _c._      _2007/2008 Performance Evaluation_

Dotson's 2007/2008 Evaluation was signed by Dotson's supervisors, Terry Parks on

September 9, 2008, and Bill Drakos on September 12, 2008.  See Defendants' Ex. E.  Skaggs had

prepared part of the evaluation, but was replaced by Parks before September 2008.  See Skaggs

Dec. ¶ 6.  The 2007/2008 Evaluation post-dates the Gause Complaint, the October 2007 Charge,

the November Terleski Letter, and the April 2008 Charge.

Like the 2006/2007 Evaluation, Dotson does not identify which specific ratings are

undeserved or false.  The parties focus on the issue of low productivity in their respective papers.

There is one glaring rating in the 2007/2008 Evaluation.   Under the "volume of work produced,"

Dotson is rated as "unsatisfactory," which appears to be the lowest rating available.  See

Defendants' Ex. E.  Since the remaining categories are generally rated as "satisfactory" (with

four categories rated "above standard"), and since the parties focus on productivity, the Court

will analyze only the rating of "unsatisfactory" under the "volume of work produced" category.[27]

---

[25]Further, Dotson has presented no authority that Drakos's request for current medical authorization was improper.  Drakos's declaration indicates that Dotson told him that she had been working under the 9/80 schedule pursuant to medical authorization "for several years."  See Drakos Dec. ¶ 3.  In the absence of cited authority to the contrary from Dotson, the Court sees nothing unreasonable with Drakos asking for current medical information, especially since Dotson was starting at a new job/location and the other authorization was "several years old."

[26]Further, the evidence indicates that Dotson worked a standard schedule for two or four weeks only.  It is not clear that this _temporary_ interruption of Dotson's work schedule would be considered something that materially affects the conditions of Dotson's employment.  See Yanowitz, 36 Cal.4th at 1036.  However, given the resolution of Dotson's claim regarding the 9/80 schedule, as well as Defendants failure to adequately discuss "adverse employment actions" under FEHA, it is unnecessary to decide this issue.

[27]Despite its concerns, as discussed in footnotes 20 and 26, the Court will not decide whether the "unsatisfactory" rating is an "adverse employment action" under FEHA.  Cf. Akers, 95 Cal.App.4th at 1457.

1    With respect to the Gause Complaint, for the same reasons that there is no causal

2    connection between the Gause Complaint and the failure to accommodate contention, there is no

3    causal connection between the 2007/2008 Evaluation and the Gause Complaint.  That is, it is

4    undisputed that Drakos, Skaggs and Parks did not know about the Complaint, approximately two

5    years elapsed from the Gause Complaint to the 2007/2008 Evaluation, and the circumstances

6    show no reason why Drakos, Skaggs, or Parks would retaliate based on the Gause Complaint.

7    See Raad, 323 F.3d at 1197; Villiarimo, 281 F.3d at 1065; Gunther, 623 F.2d at 1316; DUMF 24.

8     Dotson has failed to establish a *prima facie* case of retaliation based on the Gause Complaint.

9    With respect to the October 2007 Charge, for the same reasons that there is no causal

10    connection between the October 2007 Charge and the failure to accommodate contention, there is

11    no causal connection with the October 2007 Charge and the 2007/2008 Evaluation.  That is, there

12    is no indication that Drakos, Parks, or Skaggs were aware of the October 2007 Charge, eleven

13    months passed from the October 2007 Charge to the 2007/2008 Evaluation, and the

14    circumstances as presented do not clearly show why Drakos, Parks, or Skaggs would necessarily

15    retaliate because the October 2007 Charge complains of conduct by prior supervisors.  See Raad,

16    323 F.3d at 1197; Villiarimo, 281 F.3d at 1065; Gunther, 623 F.2d at 1316; DUMF 24;

17    Defendants' Ex. B.  Dotson has failed to establish a *prima facie* case of retaliation based on the

18    October 2007 Charge.

19    With respect to the Terleski Letter, like other complaints, there is no evidence that

20    Drakos, Parks, or Skaggs was aware of the Terleski letter.  The letter is addressed to Dr. Terleski

21    only (with no "cc's"), see Plaintiff's Ex. F, and it is not clear how Dr. Terleski viewed or dealt

22    with the letter as it does not appear to be a formal grievance.  Cf. Plaintiff's Ex. F with Plaintiff's

23    Ex. I.  Indeed, Dotson states that her letter is a response to Dr. Terleski's own request for a

24    medical note.  See Plaintiff's Ex. F ("Dear Donald R. Terleski, I received your request for a

25    medical note on November 29, 2007, following my meeting with Bill Drakos and Felicia

26    [Skaggs] on November 29, 2007.").  Nevertheless, the letter continues to explain that Dotson

27    worked the 9/80 schedule prior to Green Gardens, that prior administrators had approved of the

28    9/80 schedule but had not told Drakos, that Drakos would not approve the schedule without a

doctor's note, other administrators (including Terleski) were aware of a doctor's note, and Dotson views the situation as retaliation and harassment.  See id.  Dotson also provided to the County a doctor's note dated November 29, 2007.  See Defendants' Ex. C.  Further, Drakos's declaration does not indicate that he was aware of the Terleski Letter.  See Drakos Dec. ¶ 3;[28] see also Skaggs Dec. ¶ 3.  The evidence submitted does not indicate knowledge of the Terleski Letter, and the nature of the letter itself does not indicate knowledge.  Again, without knowledge of protected activity, there can be no retaliation.  See Raad, 323 F.3d at 1197; Gunther, 623 F.2d at 1316.  Further, ten months elapsed between the Terleski Letter and the 2007/2008 Evaluation.  This is not an insignificant period of time.  In that time, the 9/80 schedule had been in place, current medical documentation approving of the 9/80 schedule was on file, and Drakos had not pursued the matter.  Finally, the Terleski Letter discusses Drakos's decision, it does not address conduct by Skaggs or Parks.  See Plaintiff's Ex. F.  These circumstances do not indicate a causal link.  Dotson has failed to establish a *prima facie* case of retaliation based on the Terleski Letter.

With respect to the April 2008 Charge, approximately five months passed between the April 2008 Charge and the 2007/2008 Evaluation.  In her deposition, Skaggs testified that she was aware that, in 2008, Dotson had filed "a grievance against the County" for a failure to promote.  See Skaggs Depo. 68:7-19.  Apparently in an e-mail, Skaggs recommended promoting Dotson.  See id. at 66:9-13.  At some point in that e-mail, it appears that Skaggs had mentioned "protecting the County" from "an administrative point of view."  See id. at 68:3-6.  Skaggs was referring to Dotson's grievance over not being promoted.  See id. at 68:3-19.  The April 2008 Charge is the only sort of "grievance" that has been submitted to the Court that fits a time frame in which Skaggs was evaluating Dotson and that references promotion.  Since Skaggs was aware of the April 2008 Charge, it is not unreasonable to assume that Skaggs' supervisor, Drakos, was also aware.  Further, if Skaggs was considering the April 2008 Charge with respect to promotion and evaluation, and was referring to the grievance (be it indirectly) through an e-mail, it is not unreasonable to think that Drakos would also be considering the April 2008 Charge since he

---

[28]Drakos's declaration indicates that he knew that Dotson submitted a new medical note and that Skaggs approved of the schedule after discussions with Dotson's attorney; there is no mention of the Terleski Letter.  See Drakos Dec. ¶ 3.

would need to approve the promotion.[29]  See DUMF 29.  Under these circumstances, there is a

sufficient causal link.  See Van Asdale, 577 F.3d at 1002.

The County has proffered a non-retaliatory reason for the 2007/2008 Evaluation.  Drakos

declared that the reason Dotson received an "unsatisfactory" rating was that her productivity was

too low.  See Drakos Dec. ¶ 5.  Drakos declared that the standard productivity percentage that an

employee was encouraged to meet or exceed was 75%, which was tied to the department's

budget and Medi-Cal.  See id. at ¶ 4.  Dotson's productivity for the entirety of the 2007/2008

Evaluation period was 49%, but was 57% if two particularly bad months were excluded.  See id.

at ¶ 5; Defendants' Ex. E; see also Skaggs Dec. ¶ 6.  This low productivity number is a non-

retaliatory reason for evaluating Dotson as "unsatisfactory."

Dotson contends that this reason is pretext because it was known that the Anasazi system

was causing significant problems and Dotson experienced regular problems with it.  However, as

discussed above, Dotson's evidence regarding Anasazi is not sufficient to show pretext.  It is

undisputed that Dotson had regular, if not daily, problems with Anasazi.  Skaggs declared that

she herself, as well as those under her supervision, experienced problems with Anasazi.  See

Skaggs Dec. ¶ 5.  Nevertheless, Skaggs has declared (without dispute) that Dotson appeared to

have more problems with the system and that computer technicians were sent to work on

Dotson's computer.  See id.  Consistent with this declaration, the 2007/2008 Evaluation states,

"You have had some challenges with Anasazi due to the problems with the program itself, and I

commend you for attempting to overcome those issues by contacting the Anasazi core team

regularly."  Defendants Ex. E.  The evidence clearly indicates that Anasazi caused problems in

Dotson's unit at Green Gardens.  It does not, however, dispute that Dotson's productivity was

between 49% and 57%, depending on the months in which productivity was measured.  There is

no evidence concerning the amount of problems other people suffered, or the productivity figures

of others in the unit, or the ratings of others in the unit regarding "volume of work produced."

---

[29]The Court does not know about Skaggs's e-mail, other than it was sent.  It is unknown when precisely it was sent, other than pre-September 9, 2008, and it is unknown to whom it was sent.  If it was a recommendation for promotion, it would seem that Drakos would be a recipient since Skaggs could not promote.  See DUMF 29; Skaggs Dec. ¶¶ 8, 9.

1  Evidence that others in Dotson's unit had similar productivity levels but were rated above

2  "unsatisfactory" would indicate pretext, but there is no such evidence.  Further, even though

3  Skaggs recommended Dotson for promotion, she had rated Dotson as "improvement needed"

4  under the "volume of work produced" category.  See Skaggs Dec. ¶¶ 6, 9; Parks Dec. ¶ 3; see

5  also Drakos Dec. ¶ 5.  "Improvement needed" is the rating between "standard" and

6  "unsatisfactory."  See Defendants Exs. E, G, H.  Despite the recommendation for promotion,

7  Skaggs's initial "improvement needed" rating shows that Dotson suffered from a productivity

8  problem.  Skaggs and Drakos simply disagreed on the degree, either "improvement needed" or

9  "unsatisfactory," both of which are below "standard."  See id.  The problems with Anasazi do not

10  dispute that Dotson's productivity was between 49% and 57%, nor does it address how other

11  employees were rated in Dotson's unit relative to their productivity percentage.[30]  Dotson has

12  failed to produce specific and substantial evidence that the reason for the "unsatisfactory" rating

13  under the "volume of work produced" category in the 2007/2008 Evaluation was pretext.[31]

14      Because Dotson's has either failed to show a causal link, or because Dotson has failed to

15  provide specific and substantial evidence of pretext, the 2007/2008 Evaluation, i.e. the "volume

16  of work completed" category rated as "unsatisfactory," was not retaliatory.  Summary judgment

17  on this claim is appropriate.

18          *d.*      *Denial of Continuing Education*

19      There is no evidence that the County actually prevented Dotson from meeting her

20  continuing education requirements.  See DUMF 36.  Rather, the only evidence before the Court

21  is that Drakos refused to authorize Dotson's attendance at one class in February 25, 2008.  See

22  DUMF 37; Defendant's Ex. M; Drakos Dec. ¶ 7.  Assuming that the refusal to authorize

23  attendance at one course can be classified as an "adverse employment action," the conduct is not

24  retaliatory.

25

26      [30]Again, the Gutierrez declaration is of limited value since it is unknown where Gutierrez worked, whether
   she knew of the type and amount of problems that either Dotson or Dotson's co-workers experienced, and whether

27  she was aware of Dotson's co-worker's productivity levels and the co-worker's productivity ratings.

28      [31]Also, assuming that there is a sufficient causal link between the 2007/2008 Evaluation and the Terleski
   Letter, this same analysis would apply, and Dotson would not meet her burden to show pretext.

As discussed above, there is no evidence that Drakos was aware of either the Gause Complaint or the October 2007 Charge.  Without awareness/knowledge of the protected activity, there can be no retaliation.  See Raad, 323 F.3d at 1197; Gunther, 623 F.2d at 1316.  Further, the Gause Complaint and the October 2007 Charge involved different personnel, different supervisors, and a different location.  Without more evidence, no reason to retaliate for these actions is clearly apparent.

The April 2008 Charge had not yet occurred, so it could not have been the basis for Drakos to refuse approval in February 2008.

Finally, the Terleski Letter is within three months of Drakos's denial.  This timing can suggest a causal connection.  See Van Asdale, 577 F.3d at 1002.  However, as discussed above, there is no evidence that Drakos was aware of the Terleski Letter and, given the nature of the letter, it is not clear that Terleski would have necessarily disclosed it to Drakos.  Again, without knowledge of protected activity, there can be no retaliation.  See Raad, 323 F.3d at 1197; Gunther, 623 F.2d at 1316.

However, even if Drakos was aware of the Terleski Letter and there is a sufficient causal link, the County has proffered a non-retaliatory reason for the refusal to approve attendance.  Drakos has declared that he did not approve Dotson's request because her productivity was too low and because the continuing education course dealt with children/adolescents and Dotson's case load was exclusively adults.  See Drakos Dec. ¶ 7.

Dotson has not shown that Drakos's reason for denying approval was pretext.  As discussed above, Dotson has not shown that the concerns about her productivity were pretext.  Further, Dotson does not dispute that the subject of the continuing education course dealt with children/adolescents, yet Dotson's case load was limited to adults.  See Drakos Dec. ¶ 7.  There is no evidence that other employees under Drakos's supervision were allowed to attend continuing education courses that did not pertain to their clients, or that employees who had production levels similar to Dotson's were given approval to attend courses.[32]  There simply is no

---

[32]Again, Dotson's production level in February 2008 was somewhere between 49% and 57% and the standard to be met was 75%.  See DUMF 27; Defendants' Ex. E; Drakos Dec. ¶¶ 4, 5; Skaggs Dec. ¶ 6.

evidence, be it specific and substantial or not, that the reasons for withholding approval were pretext.

Dotson has failed to meet her burden either at the *prima facie* phase or the pretext phase. Drakos's denial of approval to attend a continuing education course was not retaliatory. Summary judgment on this claim is appropriate.

    *e.*    *Failure to Promote*

There is insufficient evidence that Defendants' failure to promote was retaliatory.  Prior to 2008, it is undisputed that Dotson was not eligible for promotion to SAS 2 because she did not have CADAAC certification.  See DUMF 26.  While Dotson mentions without citation to any evidence that one supervisor of unknown rank recommended her for promotion in 2003,[33] that she was not promoted indicates that the CADAAC requirement was enforced.  There is no evidence that Dotson's lack of CADAAC certification is pretext.

With respect to the failure to promote in 2008, there is no evidence that Drakos, Skaggs, or Parks was aware of the Gause Complaint, the October 2007 Charge, or the Terleski Letter.  As discussed above, neither the circumstances of the Gause Complaint or the October 2007 Charge (which dealt with different personnel, different supervisors, and a different location), nor the nature of the Terleski Letter (which was sent only to Dr. Terleski and in response to his request for a medical note) indicate a causal link with the failure to promote in 2008.  There is no *prima facie* case of retaliation with respect to the Gause Complaint, the October 2007 Charge, or the Terleski Letter.

However, also as discussed above, there is knowledge of the April 2008 Charge by Skaggs, and the evidence supports an inference that Drakos was aware of the April 2008 Charge. Further, Skaggs's deposition indicates that the April 2008 Charge was a consideration in the promotion recommendation.  Under these circumstances, Dotson has met her *prima facie* phase burden.  See Van Asdale, 577 F.3d at 1002.

Defendants have proffered a non-retaliatory reason for the failure to promote Dotson in

---

[33]The unsupported arguments of counsel are not evidence.  See Exeter, 58 F.3d at 1312 n.5; Angel, 653 F.2d at 1299; British Airways, 585 F.2d at 951-52.

2008.  Drakos declared that Dotson was not promoted in 2008 because her productivity percentage was too low, between 49% and 57% (depending on the months considered).  See Drakos Dec. ¶ 5; Defendants' Ex. E.

Dotson argues that the proffered reason is pretext because Dotson (along with everyone else) was having problems with Anasazi, the Anasazi conversion made it impossible to meet the 75% standard, Skaggs had recommended Dotson for promotion, and the 75% was selectively enforced or inconsistently enforced.  Dotson's arguments and evidence are not sufficiently specific and substantial to show pretext.

With respect to inconsistent application of the 75% standard, it appears that Dotson relies on Gutierrez's declaration and on Dotson's testimony that Jessica Chavaria was promoted despite not making the 75% standard.  First, Gutierrez's declaration is not helpful.  Gutierrez declares that she is familiar with the County's productivity requirements and that the "requirements are not consistently enforced."  Gutierrez Dec. ¶ 3.  Gutierrez's statement is too general and she does not provide a sufficient foundation for her opinion.  Gutierrez does not explain how she knows about enforcement or how individual supervisors enforce the requirement.  In particular, Gutierrez's declaration does not indicate that she has any knowledge of how Drakos enforces the 75% standard.  That Gutierrez may have experienced other supervisors who do not enforce the the 75% standard is immaterial because it was Drakos who made the decision.  Further, Gutierrez does not explain to what extent the 75% standard is enforced.  Specifically, Gutierrez does not testify about people who have performed at a level of between 49% and 57% .[34]  If Drakos was applying his standard criteria to Dotson, and if others who had similar production numbers were not promoted, then there can be no retaliation, irrespective of the practices of other supervisors in different parts of the County.  Second, Dotson indicates that she knows Jessica Chavaria was promoted despite not making the 75% standard.  See Dotson Depo. 63:24-64:18.   However, what Dotson does not indicate is by how much Chavaria did not make the 75% standard.  See id. at 64:17-18.  Drakos did not declare that he refuses promotions to people who fail to meet the

---

[34]Again, the 49% is for the entire review period and the 57% excludes two particularly bad months.  See Defendants' Ex. E.

75% standard.  Drakos declared that he did not approve Dotson because her productivity was too far below the 75% standard.  See Drakos Dec. ¶ 5.  Skaggs also declared that Drakos would not approve the promotion, not because the 75% standard was not met, but because Dotson's productivity was "significantly below" the 75% mark.  See Skaggs Dec. ¶ 6.  In other words, the key is how close to the 75% mark that an employee gets.  That Chavaria was promoted despite not making the 75% is not sufficiently probative without evidence of Chavaria's actual percentage.

     With respect to the contention that no one could meet the 75% standard during the Anasazi implementation, that position is based on Gutierrez's declaration.  However, Gutierrez offers only an opinion that, given the problems with Anasazi, the productivity requirement was "virtually impossible."  See Gutierrez Dec. ¶ 8.  This opinion is not helpful.  There is no indication that Gutierrez knew other people's productivity levels, there is no indication that she was familiar with the particular problems and the particular personnel in Dotson's unit, and there is no indication about what the average level of productivity was during Anasazi implementation.  Gutierrez does not purport to know that Dotson's levels were between 49% and 57% (depending on which months were considered), and Gutierrez offers no opinion that such production levels were normal during Anasazi's implementation period.  Gutierrez's opinion is unduly speculative, has an insufficient foundation, does not relate to Dotson's unit, and fails to indicate pretext.

     With respect to the contention that Skaggs had recommended Dotson for promotion, Skaggs declared that she believed that Dotson's interaction with clients and other team members warranted a promotion.  See Skaggs Dec. ¶ 6.  Skaggs acknowledged that Dotson's productivity was below 50%, but believed that the rest of her performance merited a promotion.  See id.  Skaggs's deposition also indicated that she thought that promotion might help to protect the County, which suggests that Skaggs viewed promotion, in part, as a prophylactic measure.  See Skaggs Depo. 68:3-12.[35]  What Skaggs's testimony shows is a difference of opinion about the

---

[35] Viewing the promotion as prophylactic, and combined with Skaggs's initial rating of "needs improvement" under the "volume work produced" category, there is an indication that Skaggs believed that productivity was a problem, but that protection for the County outweighed Dotson's low productivity.  Skaggs's testimony indicates that the April 2008 Charge may have had, at least in part, the opposite of a retaliatory effect with her.

consequences of productivity between 49% and 57% (depending on which months were considered).  Drakos disagreed with Skaggs's assessment.  Drakos's uncontradicted declaration states that he told Skaggs that he "would not authorize a promotion for anyone with such low productivity . . . ."  Drakos Dec. ¶ 5.  It is also uncontradicted that Drakos has denied promotions for at least twelve other employees whose productivity was too low.  See id. at ¶ 6.  Indeed, Dotson herself testified that she was personally aware of another employee, Angelo, who was denied a promotion to SAS 2 because of a lack of productivity.  See Dotson Depo. 65:3-9.  Skaggs has not declared or testified that Drakos had approved promotions for other employees who had productivity levels that were similar to Dotson.  There is simply no evidence that Drakos deviated from his normal criteria when he denied promotion because Dotson's productivity was too far below the 75% standard.  Skaggs's recommendation is not sufficient to show pretext.

With respect to Dotson's difficulty with the Anasazi system, the Court has previously addressed this.  Dotson had significant problems, she documented her problems with Skaggs and Drakos, and Anasazi technical personnel were sent to assist Dotson.  However, there is no dispute that her productivity was between 49% and 57%, and there is no evidence concerning the amount of problems that others in her unit suffered.  Significantly, there is also no evidence of the productivity figures of others in the unit or the ratings of others in the unit regarding productivity related categories.  There is no evidence that others under Drakos's supervision were promoted despite having production levels of between 49% and 57%.  There is no real dispute that Dotson had difficulties with Anasazi and her productivity was low, the issue is how her productivity and her difficulties compared to others in the unit.  No evidence has been submitted that she was treated differently from those who had similar productivity or similar difficulties with Anasazi.

Finally, it should be noted that there is no dispute that Drakos and Parks offered to specially reevaluate Dotson in three months time to see if her productivity had increased.  See Parks Dec. ¶ 3; Drakos Dec. ¶ 5; Defendants' Ex. E.  If her productivity increased, then the promotion would have been processed.  See Parks Dec. ¶ 3.  Dotson refused the special

1    reevaluation.  See Parks Dec. ¶ 3; Drakos Dec. ¶ 5; Plaintiffs' Ex. E.  Without additional

2    evidence, a willingness to do an early evaluation for the purposes of obtaining a promotion does

3    not on its face seem consistent with retaliation.

4         Dotson has not met her burden either at the *prima facie* phase, due to a lack of a causal

5    link, or at the pretext phase, due to a lack of specific and substantial evidence of pretext.  There is

6    insufficient evidence that the failure to promote was retaliatory.  Summary judgment on this

7    claim is appropriate.

8

9    **3.    First Claim (FEHA) & Eighth Claim (Title VII) – Hostile Environment[36]**

10        *Defendants' Argument*

11        Defendants argue that the acts identified by Dotson were non-discriminatory and did not

12   cause a hostile work environment.  As previously argued, the denial of promotion was based on

13   the lack of certification and failure to acceptably meet productivity goals.  The refusal to initially

14   allow Dotson to work the 9/80 schedule was temporary, was based on concerns of productivity,

15   and occurred once.  The evaluations for 2007 and 2008 were based on productivity concerns, yet

16   still yielded an overall rating of "standard."  Dotson's transfer in 2007 to Green Gardens was

17   done at her request as an accommodation.  The certification memoranda Dotson received were

18   sent to 300 employees and Dotson's inclusion on some was a mistake.  Finally, Dotson was

19   never denied continuing education credits, rather a request to attend a seminar was denied

20   because of Dotson's low productivity and the subject of the conference did not deal with

21   Dotson's client base.  None of the conduct is extreme, severe, threatening or abusive.

22        With respect to Skaggs, she argues summary judgment should be granted specifically as

23   to her because she did not contribute to the hostile environment or the acts identified by Dotson

24   as creating the hostile environment.

25        *Plaintiff's Opposition*

26        Dotson argues that, over the past years, each of the Defendants made personnel decisions

27

28
_____

[36]The eighth cause of action is under Title VII and is brought against only the County.  The first cause of
action is under FEHA is brought against the County, Skaggs, and Drakos.

in a distinct attempt to retaliate against her and create a hostile work environment.  This has led Dotson to be on edge with everything she does, which causes substantial emotional and physical stress/harm.[37]  Defendants routinely denied her promotion by using sham reasons, like a lack of certification and productivity issues which arose from Defendants' own computer problems.  Defendants also made it difficult for her to obtain education credits, gave her unjustified ratings, and required her to obtain a doctor's note even though one was already on file.  Defendants also assigned her duties outside of her job assignment.  But for medical leave, the hostile environment created would have caused more harm to Dotson.

### *Legal Standard*

The Ninth Circuit has recognized that retaliation may take the form of a hostile work environment.  See Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1189 (9th Cir. 2005); Ray, 217 F.3d at 1244-45.  A retaliatory hostile work environment is actionable if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Hardage, 427 F.3d at 1189; Ray, 217 F.3d at 1245.  The hostile environment must be both objectively and subjectively offensive.  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Ray, 217 F.3d at 1245.  "To determine whether an environment is sufficiently hostile, we look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Faragher, 524 U.S. at 787; Ray, 217 F.3d at 1245.  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher, 524 U.S. at 788; Hardage, 427 F.3d at 1189.

California recognizes that a hostile work environment may form the basis of a retaliation claim.  See Yanowitz, 36 Cal.4th at 1056 n.16.  California also follows the United States Supreme Court's jurisprudence regarding the severity and pervasiveness of the hostile work environment.  See Lyle v. Warner Bros. Television Productions, 38 Cal.4th 264, 282-84 (2006).

---

[37]No evidence is cited for this assertion.  See Opposition at 9:3-5.

1   *Discussion*

2       As an initial matter, Dotson claims a hostile work environment under Title VII based on

3   "gender, race, and disability."  Complaint at ¶ 50.  As discussed above, disability is not a

4   protected class under Title VII.  Accordingly, Dotson's Title VII hostile work environment based

5   on disability is not cognizable and summary judgment is appropriate.  See 42 U.S.C. § 2000ee-

6   2(a)(1), (m); Rahmann, 2010 U.S. Dist. LEXIS 21020 at *11-*12; Montanez, 660 F.Supp.2d at

7   243; Scott, 2008 U.S. Dist. LEXIS 80307 at *11.

8       The basis of Dotson's hostile work environment shows that it is intertwined with her

9   retaliation claims.  Dotson claims a hostile work environment was created by the failure to

10  promote, the failure to accommodate, and the failure to approve continuing education credits.

11  See Opposition at 9:6-17.  However, as discussed above, these acts were not retaliatory.  In each

12  instance, the County has proffered legitimate, non-retaliatory reasons for these actions.  Further, a

13  request to produce a doctors note, a one time denial of attending a continuing education course

14  that did not relate to Dotson's clients, and failing to promote at most once per year over a two

15  year period of time constitute sporadic events.  These events are not particularly severe, were not

16  physically threatening or humiliating, and there is no evidence that these acts interfered with

17  Dotson's ability to do her job.  See Faragher, 524 U.S. at 787-88; Hardage, 427 F.3d at 1189.

18  While the Court is willing to accept that Dotson perceived a hostile environment, the evidence

19  does not sufficiently show an objectively severe "hostile" environment.  See Faragher, 524 U.S.

20  at 787.

21      Dotson also argues that her name has been smeared to the point where she is constantly

22  looking over her shoulder.  However, like other parts of the opposition, there is no evidence cited

23  to support this assertion, and counsel's bare argument is not evidence.  Exeter Bancorporation,

24  Inc. v. Kemper Secs. Group, Inc., 58 F.3d 1306, 1312 n.5 (8th Cir. 1995); Angel v. Seattle-First

25  Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1982); British Airways Bd. v. Boeing Co., 585 F.2d

26  946, 951-52 (9th Cir. 1978).

27      Dotson also argues that Defendants assigned her duties outside of her job description

28  without just compensation.  Dotson cites to her Exhibit G, which is an internal grievance dated

35

October 2, 2008, against Terry Parks.  See Plaintiff's Ex. G.  The exhibit states that Dotson is grieving Parks for *inter alia* "assigning duties outside of my classification."  Id.  Under the "settlement desired" section, it reads: "I would like to be retroactively compensated for being assigned duties outside of my classification as a SAS I working as a rehab spec., doing case management."  Id.  This evidence does not show a hostile environment.  Assuming that Dotson was actually assigned duties outside of her classification, there is no indication of how often Dotson was assigned duties outside of her classification or how long she performed such duties.  It is undisputed that Dotson suffered an accident and was out of the office recovering from October 2008 to sometime in 2009, and then was assigned to a new department upon her return to work.  See DUMF's 20, 21.  With this time-line, Dotson would not have been around Parks or Parks's job assignments too much longer after October 2, 2008.  Exhibit G, either alone or in combination with the non-retaliatory conduct discussed above, does not indicate conduct that was regularly occurring, or that occurred over a longer period of time, or that was physically intimidating or demeaning, or that was severe and pervasive, .  See Faragher, 524 U.S. at 787-88.

The evidence cited by Dotson simply does not establish a sufficiently severe or pervasive hostile work environment.  Summary judgment on this claim is appropriate.

Additionally, Skaggs specifically moved for summary judgement on the FEHA claim against her.  Under FEHA, an employee "is personally liable for any harassment prohibited by this section that is perpetrated by the employee . . . ."  Cal. Gov. Code § 12940(j)(3).  Here, it is undisputed that Skaggs did not deny approval for the continuing education course, see DUMF 38, Skaggs was not the person who decided not to promote Dotson, see DUMF 29, Skaggs was not the person who initially refused the 9/80 schedule, see DUMF 23, Skaggs is not the person grieved in Exhibit G, see Plaintiff Ex. G, and Skaggs did not sign the 2007/2008 Evaluation.  See Skaggs Dec. ¶ 6.  Dotson has failed to identify any act of harassment that Skaggs committed.  Accordingly, summary judgment is appropriate specifically as to Skaggs.

## CONCLUSION

Defendants move for summary judgment on the five remaining claims in this case.

36

1    Summary judgment on Dotson's ninth cause of action is appropriate because Title VII

2   does not protect persons on the basis of disability.

3    Summary judgment on Dotson's fourth and fifth causes of action is appropriate because

4   Dotson has not produced sufficient evidence of retaliation.  The Court has considered the

5   arguments made by Dotson in her opposition, and has analyzed the identified protected activities

6   with the various identified adverse employment actions.  In each instance, Dotson's claims are

7   insufficient due to a failure to raise a *prima facie* case, a failure to sufficiently show pretext

8   through the submission and explanation of specific and substantial evidence, or a combination of

9   these two phases of the burden shifting analysis.

10    Summary judgment on Dotson's first and eighth causes of action is appropriate.  These

11   claims rely predominately on the conduct that Dotson identified as retaliatory.  However, as

12   explained, that conduct was not in fact retaliatory.  Other conduct identified by Dotson is either

13   unsupported by the evidence or does not show a severe and pervasive hostile work environment.

14   Additionally, summary judgment in favor of Skaggs is particularly appropriate because Dotson

15   has failed to show how Skaggs harassed her as envisioned by California Government Code §

16   12940(j)(3).

17

18    Accordingly, IT IS HEREBY ORDERED that:

19   1.    Defendants' motion for summary judgment is GRANTED; and

20   2.    The Clerk shall enter judgment in favor of Defendants and CLOSE this case.

21

22   IT IS SO ORDERED.

23

Dated:    March 14, 2011

24                                                    CHIEF UNITED STATES DISTRICT JUDGE

25

26

27

28